**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

-vs-                                                          Case No.  **6:08-cr-81-Orl-19GJK**

**LUIS PALOMINO GARCIA,**

**Defendant.**

_____

# ORDER

This case comes before the Court on the following:

1.      Motion to Dismiss Indictment and Request for a Hearing by Defendant Luis
        Palomino Garcia (Doc. No. 20, filed June 19, 2008);

2.      Corrected Response in Opposition to Defendant's Motion to Dismiss Indictment by
        the United States (Doc. No. 25, filed July 10, 2008);

3.      Reply to the Government's Response in Opposition to His Motion to Dismiss by
        Defendant (Doc. No. 30, filed July 11, 2008); and

4.      Bench Trial and Hearing on Defendant's Motion to Dismiss Indictment (Doc. No.
        32, filed July 14, 2008).

**Background**

On April 9, 2008, the United States indicted Defendant Luis Palomino Garcia for being
"found in" the United States after an illegal reentry in violation of Section 276 of the Immigration
and Nationality Act.  (Doc. No. 10.)  Defendant subsequently moved to dismiss the Indictment,
arguing that the charge was brought after the applicable statute of limitations had run.  (Doc. No.

20.)  The United States responded in opposition to the Motion to Dismiss (Doc. No. 25), and

Defendant, after receiving leave, filed a Reply to this Response (Doc. No. 30).  The Court noticed

a hearing on Defendant's Motion (Doc. No. 28, filed July 11, 2008), and Defendant filed a waiver

of a jury trial and request for a bench trial (Doc. No. 31, filed July 11, 2008).  On July 14, 2008, the

Court held a bench trial in conjunction with the hearing on Defendant's Motion to Dismiss the

Indictment.  (Doc. No. 32.)  The parties stipulated to all elements of the charge other than the

timeliness of the Indictment under the statute of limitations.  At the conclusion of the trial, the Court

reserved ruling on the Motion to Dismiss as well as the oral Motion for Judgment of Acquittal made

by defense counsel during the trial.  (Doc. Nos. 33, 38.)

### Findings of Fact

Defendant Luis Palomino Garcia was born in Mexico on September 1, 1956.  He entered the

United States and was deported back to Mexico on two separate occasions, on or about February 27,

1995 and on or about November 6, 1996.  After being deported in 1996, Defendant reentered the

United States without first receiving permission from the Attorney General as required by law.

On April 23, 1999, Defendant married Danette Negron, a United States citizen.  Upon

marriage, Danette Negron took the name Danette Palomino.  Approximately two years later, Mrs.

Palomino filed an I-130 Petition for Alien Relative on behalf of Defendant with the former U.S.

Immigration and Naturalization Service ("INS").  Mrs. Palomino sent this Petition to the California

Service Center where it was received on April 30, 2001.  In the Petition, Mrs. Palomino identified

Defendant's name as "Luis Palom Palomino," his full address in Mesa, Arizona, his date of birth as

September 1, 1956, his place of birth in Armeria, Colima, Mexico, and his Social Security number

ending in 5766.  In response to item 14 which states "If your relative is currently in the U.S.,

complete the following: He or she last arrived as a (visitor, student, stowaway, without inspection, etc.)," Mrs. Palomino wrote, "Came 25 yrs ago lives here."  Mrs. Palomino left blank Defendant's arrival/departure number, the date arrived, and the date the authorized stay would expire.  In response to item 16, "Has your relative ever been under immigration proceedings?," Mrs. Palomino checked the "yes" and "deportation" boxes and wrote "AZ" for the location and "1995" for the date. Several items, however, such as "other names used" and "alien registration number," were left blank.[1]  Along with the I-130 Petition, Mrs. Palomino included a copy of the Certificate of Marriage between "Luis Palmino" and "Danette Negron."  She also provided a Biographic Information Form G-325A for Defendant which was signed by Defendant.  This form did not, however, include his alien registration number.

Upon receiving Mrs. Palomino's I-130 Petition, the California Service Center sent an Additional Evidence Request ("AER") on April 3, 2002, seeking further information about Defendant's immigration proceedings, a registered or recorded copy of the marriage certificate, completed biographical information forms for both Mrs. Palomino and Defendant, photographs of Mrs. Palomino and Defendant, and evidence that "Luis Palomino" and "Luis Palmino" were the same person.  The INS also returned a copy of the Petition with certain items circled in red that needed to be corrected or completed.  The instructions for these additions and corrections stated, "If an item does not apply, please write 'None.'  N/A is not an appropriate response."

---

[1]     Someone, presumably an immigration official, has written on the original I-130 Petition, adding Defendant's FBI number, alien registration number, and listing several other names used by Defendant.  At trial, Ms. Frye testified that a copy of the original Petition was returned on several occasions to Mrs. Palomino with the incomplete items circled.  These copies, as returned to the California Service Center by Mrs. Palomino in 2002 and 2004, do not include the added information.  Thus, this information must have been added after 2004.

The INS received a response to the AER in June of 2002.[2]  The corrections to the I-130 Petition included: the addition of the name "Luis Palomino Garica [sic]" under "other names used" by Defendant, writing "N/A" for Defendant's alien registration number,[3] and adding "Mesa" as the specific location of Defendant's prior immigration proceedings.  She also indicated that Defendant was in the United States and would apply for adjustment of status to that of lawful permanent resident in the INS office in Phoenix, Arizona.  In addition to the corrections to the I-130 Petition, Mrs. Palomino included biographic information forms for herself and Defendant.  Again, Defendant's form did not include his alien registration number.  Mrs. Palomino provided pictures of herself and Defendant, a certified copy of Defendant's Birth Certificate from Mexico,[4] and a corrected marriage license reflecting Defendant's last name as "Palomino" instead of "Palmino."

On March 1, 2003, the INS  was split into three agencies under the newly created Department of Homeland Security.  The service and benefit functions of the INS became the U.S. Citizenship and Immigration Services ("CIS"), the investigative and enforcement functions of the INS became the U.S. Immigration and Customs Enforcement ("ICE"), and the border and customs functions became the U.S. Customs and Border Protection ("CBP").  Prior to this rearrangement of the INS, the enforcement and benefits functions were all within the same agency, albeit in different divisions.  After the 2003 transition, these functions were placed in separate agencies.  However,

---

[2]     The testimony at trial indicated that this was received on June 25, 2002; however, the date stamp on the response is June 24, 2002.  In any event, these materials were received prior to the due date of June 26, 2002.

[3]     As demonstrated by later submitted documentation, Defendant did in fact have an alien registration number at this time.

[4]     Defendant's Birth Certificate is in Spanish, and Mrs. Palomino did not include an English translation of the document as requested.

CIS Officer Therese Frye explained that INS service centers, such as the one which had been handling the instant I-130 Petition, were charged only with establishing the relationship between the citizen and the alien claimed on the Petition. Once the relationship was approved, the Petition would be forwarded to the field office where the alien could apply for an adjustment of status. Thus, the field office would investigate the status of the alien, not the service center.

Ms. Frye testified that an applicant could send both an I-130 Petition and an Adjustment of Status Application to the field office, where INS officials could both establish the validity of the claimed relationship between the citizen and the alien and investigate the status of the alien, or an applicant could send an I-130 Petition to a service center, where INS officials could establish solely the validity of the claimed relationship. In the instant case, the applicant chose to send the I-130 Petition to the service center to establish the relationship between the U.S. citizen petitioner and the alien instead of to the field office.

After this reorganization of the INS, the newly formed CIS sent a second AER on March 23, 2004.[5] Defendant's file suggests that, at that time, the CIS resent on August 26, 2002 request[6] for information concerning Defendant's prior immigration proceedings and the April 3, 2002 request for corrections to the I-130 Petition. The response was received by the CIS on June 25, 2004; however, Defendant's file is not entirely clear as to what was included in this response. It appears

---

[5]     The testimony concerning the number of AERs and what information was received in response to each request was somewhat unclear at trial, particularly in light of the Court's independent review of Government's Exhibit 2, the I-130 application file ("A-file") created for Defendant by the CIS. In its findings of fact, the Court will rely on Government's Exhibit 2 over any ambiguities or misstatements in the trial testimony concerning these matters.

[6]     No testimony was provided on an August 26, 2002 request.

that the documents immediately preceding an envelope stamped June 25, 2004 were provided. Therefore, it appears that the June 25, 2004 response provided additional copies of documentation concerning Defendant's name correction on his Certificate of Marriage and nine pages of various court records detailing Defendant's prior criminal history.  The court records are apparently part of the presentence investigation report prepared for a prior state criminal case against Defendant in Arizona.  In the report, Defendant's various aliases are identified, as well as two asserted dates of birth, his claimed Social Security numbers, his alien registration number, and his FBI number.

On July 20, 2004, the CIS sent a third AER to Mrs. Palomino which sought proof of her United States citizenship.  In response, a copy of Mrs. Palomino's Birth Certificate was received by the CIS on October 14, 2004.  This is the last AER in Defendant's file.

On December 29, 2004, Robert Ortiz of CIS sent an interoffice memorandum to Defendant's file stating that "a review of USCIS databases" had revealed Defendant's prior convictions and deportations and provided "evidence that the subject has re-entered and is residing in the US since being deported in 1995."  Ms. Frye testified that this memorandum suggests that Defendant's file was sent from the California Service Center to a CIS field office in December 2004 for further investigation into Defendant's immigration status.

The next recorded activity in Defendant's file is his arrest in Seminole County, Florida on February 27, 2008 for a state offense.  According to ICE Deportation Officer Mark Annotti, the Seminole County Jail keeps in regular contact with ICE's Florida office concerning arrested persons who may be in the United States illegally.  The jail alerted ICE to Defendant's detainment the day he was arrested, and ICE immediately requested Defendant's alien file from the National Records Center in Texas.  Upon receipt of Defendant's file, an ICE field agent discovered that there were two

warrants for deportation present.  Accordingly, the ICE Office of Detention and Removal in Miami determined that Defendant's case should be presented for prosecution.

Around the same time, the CIS Fraud Detection Unit in California wrote a memorandum to the CIS Background Check Unit on March 3, 2008, indicating that the CIS would be withholding adjudication of the pending I-130 Petition and referring the case to ICE for appropriate action.  The ICE Benefit Fraud Unit in California received this Request for Investigation from the CIS on March 7, 2008.  Back in Florida, on March 24, 2008, state authorities contacted ICE to let them know that Defendant would complete his state sentence in four days.  Therefore, on March 28, 2008, the Seminole County jail released Defendant to Officer Annotti, who arrested Defendant, took his fingerprints, and filed a criminal complaint against him with this Court.

On April 1, 2008, the ICE Benefit Fraud Unit in California returned the case to the CIS in California, indicating that the case was currently being prosecuting by the ICE Office of Detention and Removal in Miami.  On April 9, 2008, the CIS determined that no further investigation into Defendant's criminal history was required, and the case was "forwarded to the adjudicator for final action."  The I-130 Petition submitted by Petitioner Mrs. Palomino on Defendant's behalf to establish the relationship between her as a U.S. citizen and Defendant as an alien was then approved on May 6, 2008.[7]

An Indictment was returned against Defendant on April 9, 2008 in the Middle District of Florida, stating that on or about February 27, 2008 in Seminole County, Florida, Defendant, an alien, who previously had been deported from the United States on or about February 27, 1995 and on or

---

[7]     As explained by Ms. Frye, this means only that the CIS service center found that the marriage between Mrs. Palomino and Defendant was valid.  No decisions regarding Defendant's status as an immigrant were made by this approval.

about November 6, 1996 to Mexico, was found in the Middle District of Florida without first

obtaining consent of the Attorney General or the Secretary, Department of Homeland Security, for

reentry into the United States.

**Conclusions of Law**

**I.      Applicable Law**

Defendant has been charged with a violation of Title 8, Section 1326 of the United States

Code which provides in part:

> Subject to subsection (b) of this section, any alien who–
>
> (1)      has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
>
> (2)      enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
>
> shall be fined under Title 18, or imprisoned not more than 2 years, or both.

Immigration and Nationality Act ("INA") § 276(a), 18 U.S.C. § 1326(a) (2006).  The statute of

limitations for this crime is found in the "catch-all" provision in Title 8, Section 3282 of the United

States Code which states:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

8 U.S.C. § 3282(a) (2006).

-8-

At first glance, the application of Section 3282 to the offense of being "found in" the United States seems fairly straightforward.  In practice, however, courts have encountered complications in determining when a defendant was actually "found."

The Eleventh Circuit Court of Appeals has explained that the crime of being found in the United States after illegal reentry is complete when: (1) an individual is "discovered in" the United States (2) after entering surreptitiously, bypassing a recognized immigration port of entry.  *United States v. Clarke*, 312 F.3d 1343, 1346-47 (11th Cir. 2002) (quoting *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir.1991)).  Thus, the Eleventh Circuit interprets "found" as being synonymous with "discovered." *Id.*  Additionally, the Eleventh Circuit has opined that an individual may be *constructively* found. *Id.*  Therefore, a defendant is deemed to have been found when federal "immigration officials"[8] actually discover the illegality of the defendant's presence or "with the exercise of diligence typical of law enforcement authorities" could have made such a discovery. *Id.* (citing cases).  To be complete, this discovery requires actual or constructive knowledge of three facts: (1) the defendant's presence in the United States; (2) his identity; and (3) his illegal status. *Id.* at 1348 (citing *United States v. Herrera-Ordones*, 190 F.3d 504 (7th Cir. 1999) for this proposition); *accord United States v. Avelar-Amaya*, 238 F. App'x 534, 537 (11th Cir. 2007) (finding that offense complete when federal agents discovered the *illegality* of a defendant's presence). Of course, the Eleventh Circuit recognizes, "[a]ny constructive knowledge standard must give immigration authorities adequate time to investigate and confirm the identity of individuals

---

[8]     The knowledge of state officials as to the illegality of an immigrant's presence will not be imputed to Federal immigration officials. *Clarke*, 312 F.3d at 1348 ("[T]he phrase 'found in' contained in § 1326 refers to the actions of federal immigration officials, not those of state law enforcement officials.").

before them." *United States v. Scott*, 447 F.3d 1365, 1369 (11th Cir. 2006).  Once a defendant is found in the United States, his crime is complete, and the five-year statute of limitations begins to run.

## II.    Arguments of the Parties and Supporting Case Law

Defendant argues that he was found in the United States as early as April 30, 2001, when Mrs. Palomino submitted the I-130 Petition on his behalf, and no later than June 25, 2002, when the INS received Mrs. Palomino's response to the second AER.  Thus, according to Defendant, the April 9, 2008 Indictment was returned over five years after the completion of the crime and is therefore untimely.  In response, the United States argues that Defendant was found in the United States no earlier than December of 2004, when the case was referred to the fraud investigation units within CIS, making the 2008 Indictment timely.

### A.    Cases Supporting Defendant's Position

#### 1.    *Scott*

The cases supporting Defendant's position are either from other circuits or are from the Eleventh Circuit but are distinguishable.  One such case from the Eleventh Circuit is *United States v. Scott*, in which the Court considered whether the district court erroneously added one point to the defendant's criminal history pursuant to United States Sentencing Guideline 4A1.1(e) for being found in the United States while under a sentence of imprisonment of at least sixty days.  *Scott*, 447 F.3d at 1367.  While in jail for violating the terms of his probation, the defendant, Leonard Scott, was interviewed by an ICE agent[9] on August 25, 2004.  *Id.* at 1366.  During the interview, Scott told the agent "his true name, advised him that he had entered the country illegally, and provided the

---

[9]        The opinion does not reveal why the defendant was interviewed by ICE on that date.

agent with details about his previous deportation and illegal reentry." *Id.* at 1367.  A state court subsequently revoked Scott's probation, and while Scott was serving an 180-day sentence, he was interviewed by a second ICE agent on January 5, 2005.[10]  *Id.*  Scott again confessed his true identity and illegal status, and two days later an arrest warrant was issued for Scott on immigration violations.  *Id.*  He was indicted on January 18, 2005 for violating Section 1326(a).  *Id.*  Scott pled guilty to this charge, and at sentencing the district court added one point to his criminal history score for committing the violation while under a sentence of imprisonment of at least 60 days.  *Id.*

The Eleventh Circuit vacated this sentencing order, holding that Scott had been constructively found in the United States for purposes of Section 1326(a) when he was interviewed by the first ICE agent on August 25, 2004, prior to his sentencing for the probation violation.  *Id.* at 1370.  According to the Court, with the exercise of diligence typical of law enforcement authorities, the ICE could have confirmed Scott's identity, presence, and illegal status on that date.[11] *Id.*  Thus, Scott could not again be found in the United States at a later date.  *Id.* at 1369 ("The government correctly states that a violation of § 1326 is a continuing offense that can run over a long period of time, as the offense conduct begins when the alien illegally enters the United States and continues *until the alien is actually 'found' by immigration authorities*." (emphasis added)).[12]

---

[10]     The state officials matched the defendant's fingerprints with his immigration record and contacted ICE on January 4, 2005.  *Scott*, 447 F.3d at 1367.  An ICE agent responded to this information and interviewed the defendant the following day.  *Id.*

[11]     Though the Court discussed its conclusion as finding that there was constructive knowledge, it appears that the first ICE agent had actual knowledge of Scott's illegal presence at the time of the initial interview.  Thus, the Court was imputing the actual knowledge of the ICE agent to the "immigration authorities" rather than finding that such authorities had constructive knowledge.

[12]     Though the Eleventh Circuit recognized that immigration authorities must be given "adequate time to investigate and confirm the identity of individuals before them,"

2.      *Gomez*

Another case in Defendant's favor is *United States v. Gomez* from the Eighth Circuit Court

of Appeals.  *Gomez*, 38 F.3d 1031 (8th Cir. 1994), *cited in Clarke*, 312 F.3d at 1348 n.4.  In *Gomez*,

the defendant reentered the United States after being deported "surreptitiously without inspection

by INS officers."  *Gomez*, 38 F.3d at 1033.  He later appeared at an INS Legalization Office and

completed an INS Form I-687 as Javier Dario Gomez, a name different from the one he used prior

to his deportment, Rodrigo Rojas Gomez. *Id.*  According to the Eighth Circuit, Gomez's I-687 Form

"contained numerous false statements and provided virtually no truthful biographical data.  Gomez

provided a set of fingerprints and the social security number that he used as Rodrigo Rojas Gomez

in 1984 in connection with his application."[13]  *Id.*  Several years later, Gomez was implicated by a

_____

the Court in *Scott* made the following observation:

> In the end, a review of the record suggests that [the first ICE agent's]
> August interview and [the second ICE agent's] January interview
> were completely unrelated.  The most likely scenario appears to be
> as follows: the information gathered during [the first ICE agent's]
> interview with Scott was either set aside or lost and immigration
> authorities forgot about Scott.  The call from Broward County about
> the fingerprint match refocused attention on Scott and ICE
> rediscovered his case.  This time, they followed through on the initial
> investigation by [the second ICE agent] and Scott was quickly
> prosecuted. . . .  It appears the immigration authorities simply lost
> track of Scott in August and, only upon notification of the fingerprint
> match, restarted their investigation.

*Scott*, 447 F.3d at 1369-70.

[13]      In a footnote, the Court stated: "Both this number and a second social security
number given by Gomez had been assigned to other persons. The INS identification
system relies upon name, date and place of birth (which were falsified by Gomez),
and confirmation through fingerprinting. Social security numbers are not used as a
primary means of identification, and the numbers given are frequently fraudulent."
*Gomez*, 38 F.3d at 1033.

-12-

fingerprint found on evidence relating to a theft of jewelry. *Id.*  The Federal Bureau of Investigation and INS matched this print with prints contained in the defendant's file. *Id.*  Furthermore, an FBI comparison of fingerprints revealed that Javier Dario Gomez and Rodrigo Rojas Gomez were the same person. *Id.*  On May 7, 1993, five years and four days after Gomez's visit to the INS Legalization Office, an indictment alleging that Gomez violated 8 U.S.C. § 1326(a) was filed. *Id.* Gomez moved to dismiss the indictment, arguing that his prosecution was barred by the statute of limitations. *Id.*  The district court denied this motion. *Id.*

On appeal, the Eighth Circuit affirmed the decision of the district court, finding that knowledge of Gomez's status should be attributed to the government but only after a reasonable time for investigation. *Id.* at 1037-38.  The Court concluded that a reasonable time for FBI fingerprint processing was approximately forty-five to sixty days. *Id.*  Adding this time to the date of Gomez's I-687 application resulted in the crime falling within the five year limitations period. *Id.* at 1038. Therefore, the indictment was timely. *Id.*

Though in *Gomez* the Eighth Circuit affirmed the trial court's denial of the motion to dismiss the indictment, the Court also made clear that constructive knowledge would be attributed to the government a reasonable time after receiving the information and means necessary to determine a defendant's illegal status:

> . . . Because the INS had in its possession Gomez's fingerprints as Rodrigo Rojas Gomez and as Javier Dario Gomez, and had access to the FBI facilities for fingerprint comparison, it possessed both the information and the means necessary to determine Gomez's status as a deported alien.
>
> Where the government is in possession of all necessary information and means, we see no reason why, consistent with the rule of lenity, the "discovery rule" governing the accrual of a cause of action for the purpose of commencing the statute of limitations should not apply. . . .  The policies underlying civil and criminal statutes of limitations are similar. . . .  Were we to refuse to apply the discovery rule,

Gomez (a criminal accused) would be in a worse position than would be a defendant in a civil action. Gomez, unlike a civil defendant, would be required to live in perpetual fear of prosecution. This approach would essentially strike the statute of limitations from the United States Code. A civil plaintiff's negligence in discovering and acting upon a cause of action deprives the plaintiff of her rights in order to give repose to a defendant. Similarly, where the government possesses all the necessary information, but negligently fails to act upon it for over five years, the injury suffered by the sovereign pales in comparison to the accused's right to repose.

*Id.* at 1037 (internal citations omitted).

### 3.  *Gunera*

Finally, a Fifth Circuit case weighs in Defendant's favor, *United States v. Gunera*, 479 F.3d 373 (5th Cir. 2007). In this case, the defendant, Arturo Gunera, had previously been convicted of possession of a controlled substance under Texas law, sentenced to three years imprisonment, and deported to Honduras in 1991. *Id.* at 375. He was deported a second time in 1992 but nevertheless reentered the United States that same year. *Id.* On August 18, 1999, Gunera filed an application with the Texas Service Center for Temporary Protected Status ("TPS"). *Id.* Gunera provided "his true name, date of birth, and place of birth, all of which had been known to the INS at the time of his 1991 deportation." *Id.* The application also "contained Gunera's then-current Texas address." *Id.* However, Gunera "did not disclose that he had been previously convicted of a crime and deported, or that he had been issued an alien registration number . . . in the past." *Id.*

On September 28, 1999, the Texas Service Center ran a National Automated Immigration Lookout System ("NAILS") inquiry based on Gunera's name and date of birth. *Id.* The inquiry revealed "the prior conviction for drug possession in 1991 and that Gunera had been deported to Honduras in 1991 as an aggravated felon." *Id.* This inquiry also provided the same alien registration number under which Gunera was deported. *Id.*

-14-

The Court detailed what happened next:

> On October 1, 1999, the INS responded to Gunera's TPS application by correspondence to the provided home address, informing him of its intent to deny his application based on discovery of his prior conviction.  The correspondence also informed him that he was required to submit fingerprints if he had not already done so.
>
> On November 23, 2004, Gunera reported to the offices of Immigration and Customs Enforcement ("ICE") pursuant to correspondence requesting that he appear for further processing.  He was arrested and held in ICE custody.  Gunera moved to dismiss the illegal presence indictment of December 20, 2004 as being returned more than five years following the date he was "found" in the United States.  Following an evidentiary hearing on that issue, the district court denied the motion to dismiss.  Gunera was convicted following a bench trial.

*Id.*  The Fifth Circuit overturned Gunera's conviction and dismissed the indictment against him, finding that the indictment was untimely because the INS actually found Gunera on September 28, 1999.  *Id.* at 377.

The Court explained that this was a case of *actual*, rather than constructive, knowledge.  *Id.* at 376-77.  The Court elaborated:

> The fact that Gunera omitted information regarding his prior deportation, criminal history, and [alien registration] number from his TPS application is not relevant because the INS had in fact found that missing information as of September 28, 1999 when the NAILS inquiry was run.  We thus find distinguishable the cases cited by the Government involving the application of the statute of limitations in the context of illegal reentry prosecutions in which immigration authorities could not have known of the illegality of the alien's presence because the alien gave a false name or omitted other key information in an attempt to conceal his identity.

*Id.*  In reaching its decision, the Fifth Circuit rejected the Government's arguments that there should be a fingerprint match before actual knowledge of identity may be attributed to the government and

that the INS could not be imputed with the knowledge of the service center which lacked an investigation function and was overwhelmed by the volume of applications.[14]  *Id.* at 377.

These cases provide some support for Defendant's position that the former INS knew or should have known of Defendant's illegal presence in the United States no later than 2002.

## B.      Cases Supporting the Government's Position

### 1.      *Avelar-Amaya*

Several cases from the Eleventh Circuit support the position of the United States that the immigration authorities should not be charged with constructive knowledge of a defendant's illegal status when that defendant has presented false or misleading identifying information to the immigration authorities.  The first case is *United States v. Avelar-Amaya*, 238 F. App'x 534, 536-37 (11th Cir. 2007).   There, the defendant, Jose William Avelar-Amaya, was convicted of selling/transporting narcotics, received a 198-day jail sentence, and was then deported to El Salvador in 1993.  *Id.* at 534.  Two weeks after returning to El Salvador, Avelar-Amaya applied for an immigration visa at the United States Embassy in El Salvador.  *Id.*  On the visa application, "Avelar-

---

[14]      The Fifth Circuit stated:

> In 1999, the INS constituted the "immigration authorities," with that agency holding responsibility for both processing and investigative functions.  Further, the Government admitted that there was in fact an Intelligence Unit stationed at the Texas Service Center, to which adjudicators could refer cases for criminal investigation, but the Center simply did not refer Guner's file for further investigation of the NAILS inquiry results of 1999 until 2003.  This is not a case of attributing constructive knowledge across distinct agencies.  *See Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000) ("[T]he last we checked, the INS is one unified agency of the federal government, not a mare's nest of competing and autonomous actors.").

*Gunera*, 479 F.3d at 377.

Amaya falsely denied that he had ever been convicted of a controlled substance offense or had ever been deported.  Avelar-Amaya also failed to state he had an alien number and a social security number." *Id.* at 534-35.  He received a visa and returned to the United States on June 19, 1993.  *Id.* at 535.  He presented his visa to U.S. customs agents who permitted him to enter the United States. *Id.*

On February 1, 2006, Avelar-Amaya was arrested in Georgia on a state charge.  *Id.*  While in jail, agents from the Department of Homeland Security took his fingerprints and matched them with his 1993 deportation warrant.  *Id.*  On April 11, 2006, Avelar-Amaya was indicted for being found in the United States in violation of Section 1326 on February 16, 2006, the date on which the immigration officials matched Avelar-Amaya's fingerprints.  *Id.*  Avelar-Amaya moved to dismiss the indictment on statute of limitations grounds.  *Id.*  The district court denied this motion, and Avelar-Amaya appealed.  *Id.*  The Eleventh Circuit affirmed, finding that Avelar-Amaya was not found in the United States until February 2006, when his fingerprints were matched to his prior deportation warrant.  *Id.* at 537.

The Eleventh Circuit explained its reasoning as follows:

> The problem for Avelar-Amaya is that, although Avelar-Amaya used his real name and date of birth to obtain a visa and enter the United States, he lied about his prior felony drug conviction in the United States and his resulting deportation.  Thus, when Avelar-Amaya reentered the United States in June 1993, immigration officials were aware of Avelar-Amaya's presence in the United States, but were not aware of the *illegality* of his presence. . . .  Indeed, the failure of customs agents to discover the illegality of Avelar-Amaya's presence was attributable to not to any lack of diligence on their part, but to Avelar-Amaya's successful efforts to conceal his illegal status through the use of a fraudulently obtained visa.

*Id.* at 536 (emphasis in original).  Thus, the Eleventh Circuit concluded that Avelar-Amaya "was not constructively found in the United States in June 1993."  *Id.* at 537.  His offense was not complete

until federal officials "discovered the illegality of Avelar-Amaya's presence in the United States" in February of 2006. *Id.* The indictment was therefore timely.

### 2.   *Trejo-Arroyo*

In *United States v. Trejo-Arroyo*, the Eleventh Circuit considered whether an I-130 Form containing false information put the government on notice of the illegality of the defendant's presence. *Trejo-Arroyo*, 145 F. App'x 339, 339-40 (11th Cir. 2005). The defendant, Mario Trejo-Arroyo, submitted a form that "falsely indicated that he did not have an alien number, which he did, and that he had never been a party to immigration proceedings, though he in fact had." *Id.* at 340. The Court also noted that the district court found that the only indication of INS review of the form was two years after its submission, which was still within the limitations period. *Id.* Thus, the Eleventh Circuit concluded that the district court did not abuse its discretion "by denying Trejo-Arroyo's motion to dismiss based on its finding that the Form I-130 filed in 1998, the evidence on which Trejo-Arroyo primarily relied for dismissal of the indictment, contained two pieces of false information." *Id.*

### 3.   Cases from Other Circuits

Other cases also support the general proposition that an applicant's deception will not be rewarded by charging the government with constructive knowledge of the defendant's illegal presence. *E.g.*, *United States v. DeLeon*, 444 F.3d 41, 51-53 (1st Cir. 2006) (determining that, for statute of limitations purposes in Section 1326 prosecutions, "there can be no finding of lack of diligence where it is deception by the alien as to his identity that has caused the government not to have knowledge of his presence" and explaining that "[t]o hold otherwise would be to reward deceit by the alien and to encourage the withholding of information, and so the corruption of the

deportation process"); *United States v. Soriano-Hernandez*, 310 F.3d 1099, 1103-05 (8th Cir. 2002) (affirming the district court's decision that a statute of limitations defense would not apply to a defendant who used aliases each time he was arrested which "prevented the INS from having all of the information required to bring charges against Defendant" until a later date); *United States v. Mercedes*, 287 F.3d 47, 54-56 (2d Cir. 2002) (denying the defendant's argument that he should have been found earlier when "he was the one who attempted to deceive law enforcement officials by concealing his true identity").

These cases provide support for the Government's position that the immigration authorities used reasonable diligence in discovering Defendant's illegal presence in the United States and that any delay in making such discovery was the result of the false and misleading information provided to immigration authorities by Mrs. Palomino or her failure to provide requested information.

### III.    Application of the Law to Defendant

In the instant case, it is undisputed that the government had actual knowledge of Defendant's identity, presence, and illegal status on December 29, 2004.  The argument posed by Defendant, however, is that the immigration authorities had constructive knowledge of these facts as early as April 30, 2001 and no later than June 25, 2002.

On April 30, 2001, the INS received the I-130 Petition that indicated Defendant's name was "Luis Palom Palomino."  Thus, the name provided to the INS at that time was not Defendant's legal name, "Luis Palomino Garcia."  While his date and place of birth were correct, the Petitioner failed to provide Defendant's alien registration number.  Though the Petition stated that Defendant had previously been deported in 1995, it did not explain that he had in fact been deported multiple times. Also, the Petition deceptively indicated in response to the question asking when Defendant last

arrived in the United States: "Came 25 yrs ago lives here." Finally, the marriage certificate provided

with the Petition indicated Defendant's name was "Luis Palmino."  Thus, there were at least five

inaccuracies on the Petition as originally submitted, and it omitted requested information.  The Court

will not charge the INS with constructive notice of Defendant's identity and illegal status on this

information.  *See Trejo-Arroyo*, 145 F. App'x at 339-40 (finding the immigrations authorities did

not have constructive notice when there were two pieces of false information on petition).

Furthermore, April 30, 2001 was the deadline for filing petitions for classification under

Section 245(i) of the INA which permitted otherwise ineligible immigrants to apply for adjustments

of status by paying a $1,000 penalty fee.  8 U.S.C. § 1255(i).[15]  Ms. Frye testified that the INS

received thousands and thousands of petitions by that date pursuant to this law, such that two years

would not constitute a long processing time for these petitions.  Therefore, the failure of the INS to

discover Defendant at the time the original I-130 Petition was received was not due to lack of

diligence.

On June 25, 2002, in response to the first AER, the INS received, among other things, a

photograph of Defendant, a certified copy of Defendant's Birth Certificate, and a corrected marriage

license reflecting Defendant's last name as "Palomino" instead of "Palmino."  The corrections on

the Petition indicated Defendant was also known as "Luis Palomino Garica [sic]."[16]  Also, as on the

---

[15]   This provision was originally enacted in 1994 with a sunset date of October 1, 1997.
Act of August 26, 1994, Title V, § 506(b), Pub. L. 103-317, 108 Stat. 1724, 1765-66.
This sunset date was extended to January 14, 1998 and then extended again to April
30, 2001.  Act of November 26, 1997, Title I, § 111(a), Pub. L. 105-119, 111 Stat.
2440, 2458; Legal Immigration and Family Equity Act, Title XV, § 1502(a), Pub. L.
106-554, 114 Stat. 2763, 2763A-324 (2000).

[16]   This appears to be a misspelling of "Garcia."  The birth certificate of Defendant with
the name "Garcia" was included with the corrected Petition.

-20-

original Petition, a Social Security number was included for Defendant.  However, Defendant's alien

registration number was again not provided, nor was any information other than the addition of

"Mesa" as the location of Defendant's 1995 deportation.  This information was provided in response

to the following request by the INS:

> You indicate on the petition that the beneficiary, Luis Palomino, is under
> immigration proceedings.  Please submit an explanation of why the beneficiary is
> under immigration proceedings, including all information, circumstances, dates, file
> numbers, and photocopies of any correspondence relating to this matter.

The issue is whether the INS, with the exercise of diligence typical of law enforcement

authorities, nevertheless should have discovered the illegality of Defendant's presence at this time.

The question is close based on existing case law.  Court concludes that the answer in this case is no.

At the time it received the response to the first AER in June of 2002, the INS was still one

single agency with both investigative and enforcement capabilities.  On re-cross examination, Ms.

Frye conceded that it was easy during this time to refer matters to enforcement agents within the

INS.  However, Ms. Frye also explained that the INS service centers were only responsible for

establishing the claimed relationship between the citizen and the alien.  The field offices, on the

other hand, had the resources both to establish this relationship and to investigate the status of the

alien.  Since Defendant's Petition was sent to a service center rather than a field office, the

information provided about Defendant was being reviewed by an agent responsible for determining

the validity of Defendant's marriage alone and not by an enforcement official or an agent

investigating Defendant's alien status.

Additionally, the I-130 Petition omitted crucial information and contained several critical

errors concerning Defendant's identity.  When the INS received the materials in response to the first

AER on June 25, 2002, the "corrected" Petition indicated "N/A" for Defendant's alien registration

number, even though the instructions explicitly stated that this was an invalid response. Despite specifically being asked to provide records concerning Defendant's prior immigration proceedings, no such records were provided in the 2002 response.

This case is thus distinguishable from those in which the actual knowledge of a particular immigration official was imputed to the "immigration authorities," such as *Scott*, 447 F.3d at 1369-70, and *Gunera,* 479 F.3d 376-77. Since in 2002 the INS did not have definitively identifying information for Defendant such as his fingerprints, the instant case is also distinguishable from *Gomez*, 38 F.3d at 1037-38. Rather, Defendant's circumstance is similar to those cases in which a defendant's deception and misinformation delayed the immigration authorities' discovery of the defendant's illegal presence rather than a lack of diligence on the part of these officials. *See, e.g.*, *Avelar-Amaya*, 238 F. App'x at 536-37; *Trejo-Arroyo*, 145 F. App'x at 339-40; *DeLeon*, 444 F.3d at 51-53; *Soriano-Hernandez*, 310 F.3d at 1103-05; *Mercedes*, 287 F.3d at 54-56.

Furthermore, as Ms. Frye explained, Defendant's Petition was submitted at a time when the INS was being overwhelmed by a deluge of immigration applications due to the sunset provision of INA § 245(i). Just a little over four months after Defendant's Petition was submitted, this country experienced the September 11, 2001 attacks on New York City and Washington, D.C. These tragic events resulted in heightened security measures, greater demands on law enforcement agencies, and closer scrutiny of existing immigration policies and practices, eventually resulting in the massive reorganization of the INS into three agencies in 2003. Given this larger context, the failure of the INS immediately to recognize the illegal presence of a single alien and to initiate a prosecution against him under the facts of this case cannot fairly be attributed to a lack of diligence.

Once the Petitioner wife actually provided in October of 2004 the materials requested by the immigration authorities concerning Defendant's prior deportation proceedings, the CIS promptly began to investigate the possible illegality of Defendant's presence.  On December 29, 2004, a CIS agent concluded that Defendant had illegally reentered the United States.  This is the earliest date under the case law on which Defendant could have been found in the United States in violation of Section 1326.  Defendant's case was referred to the ICE for prosecution in 2008, and Defendant was indicted on April 9, 2008.  This Indictment was returned within five years of the earliest possible date of Defendant's discovery, December 29, 2004; therefore, the Indictment was timely, and Defendant's Motion to Dismiss must be denied.

At trial, both parties stipulated to all other elements of the offense, and so there are no remaining disputed issues to resolve.  Thus, having received evidence and heard the arguments of the parties, the Court adjudicates the Defendant guilty of violating 8 U.S.C. § 1326(a).

## IV.    Further Analysis

In this Court's view, the case law interpreting "found in" the United States under Section 1326(a) should be reexamined.  The relevant case law implies that a defendant may only be "found" once under this provision, and further that such defendant may be "constructively found."  This interpretation of Section 1326(a), however, when considered in conjunction with the statute of limitations found in Section 3282, leads to results which are not consonant with the terms of the statute and its legislative history.  It is the belief of the undersigned that current case law construing Section 1326(a) should be reconsidered for the reasons stated below.

## A.      Offense Is Completed When Defendant Is First "Found"

To begin, the statute makes it a crime for an illegal alien to reenter the country and be "*at any time* found in" the United States.  8 U.S.C. § 1326(a)(2) (emphasis added).  Finding that a defendant alien may be found only once in the United States at best renders the phrase "at any time" mere surplusage[17] and at worst contradicts the plain meaning of the statute.  Neither is a desirable result.[18]

One way to give meaning to this language is to find that the offense may occur on multiple occasions.  As the Seventh Circuit Court of Appeals has recognized, nothing in the statutory language "states or implies that an alien may be 'found' just once."  *United States v. Are*, 498 F.3d 460, 464 (7th Cir. 2007) (quoting *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006)).  Thus, an alien may be found on June 25, 2002 and then found again on February 27, 2008.  While an April 9, 2008 Indictment for the June 25, 2002 offense would not be timely under Section

---

[17]      *See, e.g.*, *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 944 (11th Cir. 2001) ("Such a result would violate the canon of statutory construction that discourages courts from adopting a reading of a statute that renders any part of the statute mere surplusage."); *id.* (citing *Bailey v. United States*, 516 U.S. 137, 146 (1995) for the proposition that "each word in a statute is intended to have [a] 'particular, nonsuperfluous meaning'").

[18]      There is nothing in the record to show that Defendant actually was present at any time at the Mesa, Arizona address given in the I-130 Petition.  He certainly was not at that address when he was arrested on February 27, 2008 in Seminole County, Florida.  Contrary to the Petition's assertion that he had lived at that address for twenty-five years, he had been deported at least twice during that period.  The record does not show if Defendant left the United States at any time after the I-130 Petition was filed, another reason why limiting the immigration service to a one time "finding" of Defendant is not appropriate.

3282, an Indictment for the February 27, 2008 offense would fall within the limitations period and would not be precluded by the prior offense.[19]

A more logical way to give meaning to the phrase "at any time" is to treat the crime as a continuing offense. The Eleventh Circuit has suggested in passing that "a violation of § 1326 is a continuing offense," and the Seventh Circuit has explicitly adopted this interpretation. *Scott*, 447 F.3d at 1369; *Are*, 498 F.3d at 464. *But see United States v. Rivera-Ventura*, 72 F.3d 277, 281-82 (2d Cir. 1995) (discussing the presumption against finding an offense to be continuing and declining to find that Section 1326 defines a continuing offense). As the Seventh Circuit explained, "Treating the 'found in' version of § 1326(a)(2) as a continuing offense 'is a logical consequence of its language' . . . ." *Are*, 498 F.3d at 464 (quoting *Rodriguez-Rodriguez*, 453 F.3d at 460). In other words, Congress' use of the word "found" demonstrates its intent to create an offense that follows the alien. *Id.*

## B.   Constructive Knowledge Standard

Secondly, the current Eleventh Circuit case law recognizes a constructive knowledge standard which places the burden on "immigration officials"[20] to use "diligence typical of law

---

[19]    By analogy, a drug dealer may sell drugs illegally to an undercover government agent on a series of dates over a many year period. The fact that the drug dealer is not indicted for the first sale, which is beyond the statute of limitations, does not bar the Government from filing an indictment as to the last sale, which is within the statute of limitations, even though the government knew defendant's identity and that he was illegally selling drugs from the date of the first drug sale.

[20]    The definition of the relevant government actors as "immigration officials" is vague and overly broad, particularly in light of the split of the INS into three separate agencies.

enforcement"[21] to discover the illegal presence of immigrants or risk the running of the statute of limitations.  While the statute does create criminal liability in terms of the government's action in "finding" a defendant, it should not follow that the statute also creates a burden on the government to actively seek out such defendant.  Significantly, the statute does not provide for a constructive knowledge standard in its text; the standard is purely the result of judicial creation.

The judicially imposed "constructive knowledge" analysis results in a nearly impossible burden on the enforcement agency.  With over 12 million[22] illegal aliens in the United States and the enforcement agency of the government overwhelmed by these numbers, the constructive knowledge standard gives the illegal alien a "free pass" that enables him or her to stay in the United States and live below the radar indefinitely unless a separate crime is committed for which the government has the resources to prosecute.  In other words, the alien who is constructively found but not indicted within the five year limitations period may continue to violate the law with impunity by remaining in the United States thereafter.  The alien will only be subject to prosecution if he or she commits some other crime.  Such a result is inconsistent with the purposes of the INA and the policies underlying the statute as detailed below.

---

[21]   The "diligence typical of law enforcement" standard is not well defined.  It is unclear which law enforcement agency's diligence is to be used as the benchmark or whether such standard takes into account the special problems facing immigration officials. Imposing such standard on law enforcement results in executive policymaking decisions being placed in the hands of the courts.

[22]   Pew Hispanic Center, *Modes of Entry for the Unauthorized Migrant Population* (2006), *available at* http://pewhispanic.org/files/factsheets/19.pdf; Michael Hoefer, Nancy Rytina, & Christopher Campbell, Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2005* (2006), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/ILL_PE_2005.pdf.

### 1.    Legislative Context

The statutory language "enters, attempts to enter, or is at any time found in, the United States" in Section 1326 has been included in the INA since its codification on June 27, 1952.  INA § 276, Pub L. 82-414, 66 Stat. 163, 229 (1952).  This section drew from the language of three precursor statutes which, in part, made it a crime for a previously deported alien to: (1) "attempt thereafter to return to or to enter the United States," Act of February 5, 1917, ch. 29, § 4, Pub. L. 64-301, 39 Stat. 874, 878; (2) "return to or enter the United States or attempt to return to or to enter the United States," Act of October 16, 1918, ch. 186, § 3, Pub. L. 65-221, 40 Stat. 1012, 1012; and (3) "enter[] or attempt[] to enter the United States," Act of March 4, 1929, ch. 690, § 1, Pub. L. 70-1018, 45 Stat. 1551, 1551.  Congress added to these previous prohibitions by including the language "at any time found in" to Section 276 of the INA in 1952.

While the legislative history of the INA does not offer any specific explanation for the added language,[23] it does provide some general background information placing the language in context. The INA was the first integrated immigration act, introduced in the House of Representatives and

---

[23]    For instance, a 1950 Report of the Senate Committee on the Judiciary, which made recommendations concerning the proposed integrated bill on immigration, stated only, "The provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty." S. Rep. No. 81-1515 at 656 (1950).  While in a later section the Report discussed amendments to Section 3282 concerning the general statute of limitations in the criminal code, it did not discuss the relationship between this provision and the reentry provision. *See id.* at 779.  Similarly, during the debates on the bill in both the House of Representatives and the Senate, Section 276 of the INA was never discussed.  *See* 97 Cong. Rec. 12876 (1951); 98 Cong. Rec. 563, 1053, 1293, 1940, 1956, 2229, 4301-21, 4399-416, 4422-44, 4433, 4450, 4665, 4890-91, 4986, 4996-97, 5003-06, 5088-115, 5149-81, 5184-85, 5207-18, 5228-40, 5314-22, 5326-34, 5408-43, 5603-31, 5637-38, 5756-804, 5862, 6947-91, 7016-19, 7128, 7167, 8082-85, 8214-26, 8253-68 (1952).

the Senate as the McCarran-Walter Bill after its sponsors, Senator Pat McCarran and Representative

Francis E. Walter.  As Senator McCarran explained during the Senate debates:

> Mr. President, in opening the debate on the bill S. 2550 to revise the laws relating to immigration, naturalization, and nationality, and for other purposes, I shall, before discussing the provisions of the bill, make a few preliminary remarks respecting the background of the bill.
>
> Senate bill 2550 represents an undertaking which has never before been accomplished in the history of the Republic; namely, to revise and codify all the numerous immigration and naturalization laws.  Since the first immigration law of 1798, these laws have been enacted piecemeal and consist of literally hundreds of enactments which have been supplemented and implemented by thousands of rules, regulations, proclamations, Executive orders, and operations instructions.
>
> The bill which is before the Senate today has not been hastily conceived.  It is rather the result of an intensive investigation and study of our entire immigration and naturalization system over the course of 2 ½ years, conducted by a subcommittee of the Senate Committee on the Judiciary, of which I had the honor of being chairman.

98 Cong. Rec. 5088.  The Senator also stated:

> The bill does not, however, undertake to change any of the provisions of existing law merely for the sake of change.  It has been my policy not to change provisions of the present law which have proved to be sound, especially since throughout the years there has been built up a body of judicial and administrative interpretations upon which we can rely.

*Id.* at 5089.

This bill was introduced during a time when the United States was experiencing serious

problems with illegal immigration.  The 1950 Report of the Senate Committee on the Judiciary

explained: "The illegal entry of aliens into the United States is one of the most serious and difficult

problems confronting the Immigration and Naturalization Service."  S. Rep. No. 81-1515 at 629-30.

The Report continued, "Since the end of World War II, the problem of illegal entry has increased

tremendously."  *Id.* at 630.  It noted specifically, "Illegal entry of Mexican citizens has increased at

-28-

a tremendous rate each year since 1943." *Id.* The Report then stated, "There is ample evidence to

indicate that there is an alarmingly large number of aliens in the United States in an illegal status."

*Id.*; *see also id.* at 632-33 (discussing various INS investigation statistics).

In considering the proper legislative solutions to the illegal immigration problem, the Senate

Committee on the Judiciary received testimony from various INS officials.   The 1950 Report

summarized some of this testimony as follows:

> The testimony of witnesses and the comment received from field offices of the
> Immigration and Naturalization Service stressed certain sections of the present law,
> particularly those relating to illegal entry and smuggling of aliens.   Most of the
> statements were devoted, not so much to the law itself, but to the difficulties
> encountered in getting prosecutions and convictions especially in the Mexican border
> area.   It was stated that many flagrant violators of the immigration laws are not
> prosecuted or, if prosecuted, get off with suspended sentences or probation.
> Apparently the reason for this is the fact that the aliens in most cases will be deported
> regardless of conviction and sentence, and the crowded conditions prevalent in most
> prisons and penitentiaries.

*Id.* at 654.[24]   Thus, the INA was enacted at a time when the United States was trying to solve the

problem of illegal immigration, particularly from Mexico.   *See* 98 Cong. Rec. 5330 (statement of

Sen. McCarran) ("The cold, hard truth, Mr. President, is that today, as never before, untold millions

are storming our gates for admission and those gates are cracking under the strain.").

Senator McCarran and Representative Walter both explained that the INA was intended to

plug the loopholes then present in the immigration system.   *E.g.*, 98 Cong. Rec. 5089 (statement of

Sen. McCarran); *Revision of Immigration, Naturalization, and Nationality Laws: Hearings on S.*

*716, H.R. 2379, and H.R. 2816 Before the Joint Subcomms. of the Comms. on the Judiciary*, 82d

---

[24]    The Report declined to recommend harsher punishments for immigrants found in
violation of the laws, explaining that this would make prosecutions even more
difficult.  S. Rep. No. 81-1515 at 654.

Cong. 4 (1951) (statement of Rep. Walter).  The legislative purpose behind the bill was to limit illegal immigration practices rather than to create new loopholes.

The intended effect of the McCarran-Walter bill may also be inferred from the criticism of the bill.  For instance, many critics found that it was too harsh on immigrants.  In vetoing the bill, President Truman stated, "By and large, the changes that would be made by the bill do not depart from the basically restrictive spirit of our existing laws–but intensify and reinforce it."  President's Message to Congress Transmitting His Veto of H.R. 5678, a Bill to Revise the Laws Relating to Immigration and Nationality, and for Other Purposes (June 25, 1952), H.R. Doc. No. 82-520 at 8, *reprinted in* 1952 U.S.C.C.A.N. 921.  One particular provision that was subject to significant criticism was the removal of statute of limitations on deportations for those individuals that were deportable at the time of entry.  *E.g.*, *id.* at 6.  In responding to this criticism, Representative Walter explained:

> [The provision at issue] does, however, cover the situation where an alien succeeds in hiding in the United States.  If that man is successful for 5 years his status can't be adjusted.  Your committee felt that that was wrong.  We felt there should not be a premium placed on the ability of an alien to conceal himself.  Under the provisions of this new bill where such a situation exists that alien is deportable.

98 Cong. Rec. 4302.  This indicates a legislative policy of limiting the application of the statutes of limitations rather than expanding its reach in cases dealing with illegal aliens.

Additionally, the bill called for greater restrictions placed on aliens convicted of crimes.  As Representative Walter stated, "Immigration is rendered difficult for the criminal."  *Id.* at 4302 (statement of Rep. Walter).  In responding to criticism that such provisions were unduly restrictive, Senator McCarran said:

-30-

> Why is it, Mr. President, that the opponents of this measure persist in attacking provisions of the McCarran-Walter bill as though they were cleverly devised snares for innocent aliens when the truth is that the very provisions which they attack have been basic provisions of our immigration law for generations and are designed to screen out the subversives,[25] the criminals, and the undesirables.

*Id.* at 5330.  This evidences a policy of restricting the opportunities of aliens previously convicted of crimes and again demonstrates the purpose of the INA to close loopholes and stem problematic illegal immigration practices.

The historical context and legislative policies at the time the INA was enacted are important to any constuction of the statute.  An interpretation of Section 276 of the INA which places a burden on the already over-burdened immigration authorities to discover aliens who have illegally reentered the country or else risk the running of the statue of limitations is antithetical to the policies underlying the INA.  Giving aliens who are not indicted within five years of their "constructive" discovery a "get out of jail free card" contravenes Congress' efforts in the INA to close loopholes in immigration policy.[26]

---

[25] The discussion of "subversives" underlies  the context of this debate which took place at the height of fear of Communism in this country.

[26] Furthermore, proposed legislation for 8 U.S.C. § 1325, which criminalizes illegal entry in to the United States, seeks also to criminalize the unlawful presence of an alien in order to bring this provision in line with the "found in" offense in Section 1326.  *E.g.*, H.R. 4065, 110th Cong. § 203 (1st Sess. 2007) (proposing to add "unlawful presence" to offense definition in Section 1325); H.R. Rep. No. 109-345, Part I at 61 (2005) (though never enacted, the bill which this Report discusses is described as bring Section 1325 "into harmony" with the "found in" offense of Section 1326 by making it a crime "for an alien to be 'present in the United States in violation of the immigration laws or regulations prescribed thereunder'"); Michael John Garcia, Library of Congress, Congressional Research Service, CRS Report for Congress, *Criminalizing Unlawful Presence: Selected Issues* 2 (2006), *available at* http://www.ilw.com/immigdaily/news/2006,0509-crs.pdf ("Although an alien who unlawfully enters the United States is potentially subject to removal and criminal prosecution, an alien found unlawfully present in the U.S. is typically subject only

2.      **Case Law**

The Seventh Circuit has recognized the inconsistency between a constructive knowledge standard and the text and purpose of the INA.  In *Are*, the Seventh Circuit rejected a constructive knowledge standard, finding that at a minimum actual knowledge was required.  *Are*, 498 F.3d at 466.[27]  According to the Seventh Circuit, "given the straightforward language and manifest purpose of the statute," the phrase "'found in' must have the force of 'present in' rather than 'discovered by the INS to be in.'"  *Id.* at 464, 466 (quoting *United States v. Lopez-Flores*, 275 F.3d 661, 663 (7th Cir. 2001)).  The Court elaborated:

> Thus, we have held that for purposes of liability and venue, the "found in" crime does not occur only  at the instant of its detection.  The crime is *being* in the United States and is not limited to the instant at which a federal agent lays hands on the person and a light bulb in the agent's head illuminates the mental sign "This guy's an illegal alien."

*Id.* at 464 (internal citations and quotation marks omitted).  The Court later explained:

> . . . To be "found in" the United States without permission after deportation means to be "present in" the United States without permission after deportation; the immigration agency's "discovery" of the alien (whether actual or constructive) is not an element of the offense.  We have held open the possibility that the date of actual discovery might have a bearing on the running of the statute of limitations.  But because the "found in" version of § 1326(a)(2) is a continuing offense, the date on which the immigration agency "should have discovered" the alien is simply irrelevant.

---

to removal.  Unlawful presence is [currently] only a criminal offense when an alien is found in the United States after having been formally removed or after departing the U.S. while a removal order was outstanding.").

27      *United States v. Gordon*, 513 F.3d 659, 665 (7th Cir. 2008) ("Under *Are*, the limitations period in an illegal reentry case begins to run, at the earliest, when the immigration authorities actually discover the illegal alien's presence, identity, and status.  At the latest, it begins to run when the alien turns himself in or is arrested." (internal citations omitted)).

> . . . As we noted in *Rodriguez-Rodriguez*, a deportee who has reentered surreptitiously prolongs his illegal presence in the United States each day he goes undetected.  The limitations clock does not run during this period because the deportee's crime continues; he remains illegally "present in" the United States.

*Id.* at 466 (internal citations and quotation marks omitted).

Also, as the Seventh Circuit has recognized, a constructive knowledge standard is inconsistent with the law for other continuing offenses.  The Court in *Are* explained:

> For other continuing offenses–conspiracy, escape, and failure to report to prison, for example–the limitations period does not begin to run until some affirmative event puts an end to the defendant's continuing criminal conduct.  In conspiracies this is the date the defendant withdraws or is captured, and for escape and failure to report, it is the date the defendant turns himself in or is caught.  Applying a similar statute of limitations trigger to the § 1326(a)(2) "found in" offense would start the limitations period when the alien surrenders or is arrested.

*Id.*

Furthermore, sound policy reasons support the Seventh Circuit's view.  As the *Gordon* Court reasoned, "so long as an alien hides well for five years after giving the government a mere sniff of his presence, he cannot be prosecuted.  While blatant flight from justice may toll the statute of limitations, we need not provide an incentive to illegal aliens to subtly fly under the government's radar."  *Gordon*, 513 at 664.

The statutory analysis and policy articulated by the Seventh Circuit is a better reasoned approach to the issue of the application of the statute of limitations to the crime of being found in the United States in violation of Section 1326(a).  A constructive knowledge standard based on the earliest date the enforcement agency should have "found" the alien in the United States with the exercise of diligence, which bars all subsequent prosecutions for later "findings" of the alien in this country, is inappropriate for determining when the offense is completed.  Such result is contrary to

both the language and the legislative history of the statute.  Thus, this Court urges reconsideration of the case law of the Eleventh Circuit on this issue.

## Conclusion

Based on the foregoing, the Motion to Dismiss Indictment by Defendant Luis Palomino Garcia (Doc. No. 20, filed June 19, 2008) is **DENIED**.  As to the sole Count of the Indictment, the Court finds Defendant, Luis Palomino Garcia, **GUILTY** of the offense of being found in the United States, having previously been deported, without first obtaining permission for reentry from the Attorney General or the Secretary, Department of Homeland Security, in violation of Title 8, United States Code, Section 1326(a).  Sentencing will be scheduled by separate notice.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on July  _22_ , 2008.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Assistant United States Attorney
Attorney for Defendant
Defendant